All right, we're ready. Thank you, Your Honors. Good morning, and may it please the Court. My name is James South, and I represent the appellant, Mr. William Lawson. Your Honors, as I've been reviewing this case and preparing for oral argument, there is one question that I think Excel has never been able to answer in this case, and if they could answer it, they cannot do so without discriminatory animus, and I think that's why this case goes to a jury. Would you say that again, please? I couldn't hear you. Sure. There is, I think, one question that this case is distilled to at its core, and that one question is something Excel has never been able to answer. If they could answer it, they cannot do so without discriminatory animus or discriminatory motive, which is why I think the case goes to a jury, and that question is this. Why retain David Curry and fire Ben Lawson? And if I can, briefly, Your Honors, I'm going to provide some context that's going to help explain why that question is so important. I don't know anything about construction, but I've had to learn more than I care to know about the construction field, and Excel Contracting essentially constructs the different plants that we have around Lake Charles area, or they certainly work for quite a lot of them. Their roles are split into two parts. One are what we call maintenance projects. A maintenance project means the facility has been complete, the project has been complete, you're simply maintaining the facility you've constructed. The second is a capital project, and a capital project would be the actual building and construction of that facility, of that live unit. Obviously, when it's a capital project, there's substantially more workers that are brought in, and they are laid off when that capital project is concluded. Your full-time employees, of which there is no dispute Ben Lawson was a 25-year certified welding inspector, had been working for Excel for years and its predecessor entity for even years beyond that. Your full-time worker, like Ben Lawson, his role is different. Ben Lawson's role is to rove and to not only work on some of the capital projects, but also the maintenance projects as well. So when you have a ramp up or you have a ramp down, that does not affect someone like Ben Lawson. There is also no dispute in the record that when Ben Lawson has his medical incident, August 21st, 2017, and he leaves to go take care of his issues, Excel specifically brings in David Curry as a temporary replacement to fill in for Mr. Lawson while he's out on part issues. Something happens, however, to David Curry. He morphs from a temporary employee into what I'll call a project-specific employee. There is a plant in Lake Trolls Area known as Indorama. David Curry is assigned to the Indorama project. He works as a project-specific employee to Indorama, and here's where this question again becomes significant. When the remainder of the employees that are laid off, when Indorama comes to an end, who is laid off is the full-time QA, QC person or Quality Assurance, Quality Control person who was never directly tied to Indorama. And so the question becomes, your prior practice at Excel, common sense, logic, all dictate that the way Excel has practiced in the past is they maintain their team, the people that have been there with institutional knowledge for projects and ramped down for projects. Why retain a project-specific employee when the project ends, yet fire your long-term person? Absent discriminatory animus, the question has never been answered and I will posit cannot be answered. And to that effect, the case must go to a jury to ask, was there some other motivation that was behind the decision made to deviate from their standard practice? And to that regard, we believe the District Court erred in three key areas. The first is under the ADA. He brings an American's, when I say he, excuse me, Mr. Lawson, and you may have heard me refer to him as Ben Lawson, that is an informal name for him, it is formally William Lawson, but I'll refer to him as Ben. Mr. Lawson brings his ADA claim and the court dispenses with it rather quickly and Excel makes this argument as well, saying we didn't meet our prima facie burden under the ADA claiming somehow that he does not have a disability. With all due respect, the District Court misses the reading of how a disability is defined, so does Excel. A disability under the 2008 amendment to the ADA expressly dealing with the Singleton case broadens the scope of disability to give effect to the ADA's remedial purposes and it states in pertinent part that a disability means a physical or mental impairment that substantially limits one or more major life activities. It goes on to state in 1, 2, I'm sorry, in 2B, that for purposes of paragraph one that I just read, major life activity also includes operation of a major bodily function, lists several, circulatory is the one that's most important here. What Excel hinges their hat on is when Mr. Lawson came back to work, he had no doctor's note restricting him from anything. You see that misses the mark and here's why. This is not a worker's disability case. If it were, I would face a qualification argument. Well, Mr. Lawson is no longer qualified because as a qualified individual, he must be able to do the essential functions of his job with or without accommodation. If there were some limitation on what Mr. Lawson could do, then arguably Excel would have a qualification argument. No, rather because this is an ADA case, the key question is, do you have something that substantially affects either a major life activity, working is one, there are many other life activities, it doesn't have to affect his work, but also, also, does it affect a major bodily function? There is no question in the record that when he has, by the way, Mr. Lawson in the record has high blood pressure, that is his condition. The high blood pressure manifested itself on August 21st when he had an on-site medical incident. He leaves for several weeks to tend to himself and when he leaves to tend to his issues, Dr. Mulher and his cardiologist diagnosis him with a 30% heart blockage. There is no substantial or genuine issue here that he suffers from a disability that affects his cardiovascular system. Now, with proper medicine, it can be controlled, it can be remediated, which allows him to perform the substantial functions of his job with the medicine or without the medicine, without the accommodation. If he couldn't perform his job, he arguably wouldn't be qualified. And so this looking within the case to say, well, Mr. Lawson wasn't limited, so because he wasn't limited, he wasn't disabled, with all due respect, that misses the mark of how the ADA defines a disability. And to say we didn't meet our prima facie burden under the ADA misses the mark for that sole reason. Under the FMLA, the second claim that Mr. Lawson brings, again to provide a little bit of factual context to help explain the FMLA in this case, August 20, I'm guilty of that because when I get fired up and I know I have 20 minutes or 15 minutes, I try to rush through it. Under the FMLA, he takes leave August 21st. That's his onsite incident. August 23rd, 2017, two days later, David Curry's brought in as the temporary replacement for Mr. Lawson because of the medical issue. August 27th, 2017, and this is 1903 in the record. It's a very compelling email. August 27th, 2017, on a Sunday night, Mr. Lawson sends an email and he includes all the relevant decision makers, Barry Carpenter, Lee Gross, the HR department. He includes everyone and he discloses. He doesn't know if he's going to need disability paperwork. He doesn't. He discloses the blood pressure issue again. He disclosed it, by the way, 1657 in the record. He discloses blood pressure in his intake paperwork so they knew about it from the very beginning. The blood pressure issue just simply didn't manifest as a problem onsite until August 21st, 2017. So in 1903, in the record, he sends this email disclosing all of these issues to Excel in more detail to them. Less than one week, less than one week after the August 27th email, by September 1st of 2017, despite previous assurances made by Excel that these two quality assurance and quality control individuals, a man by the name of Anderson and a man by the name of Lawson, were going to remain equal. Their previous superior, the manager, Mr. Hungerford, had resigned. There was a promise no one was going to be made, promoted to Mr. Hungerford's position. They would remain neutral. Mr. Anderson, Mr. Lawson. Mr. Anderson, by the way, is substantially younger than Mr. Lawson. Within one week, September 1st, Excel promotes, over an express prior promise, promotes Anderson over Lawson, making Lawson a subordinate to someone who is, my reposition, is clearly less qualified as we lay out in the brief, as well as substantially younger. That's the first act that shows the intent here of Excel in how they responded to finding out this information by Mr. Lawson. Where I think Excel misses the mark here in the FMLA case is they claim that because the termination of Mr. Lawson occurred in January of 2018, not in September of 17, but January of 18, the only evidence that we have is this five-month mark, which I will agree, under Fifth Circuit precedent, other precedent as well, that if you're looking at temporal proximity alone, just at temporal proximity alone, five months would be too attenuated. There's two problems with their argument. The first is because a prima facie burden and a pretext burden are allowed to be flexible, they're meant to be flexible, a lot of times you find pretext evidence used in the prima facie side of the case and vice versa. By doing that and saying we're not going to consider your pretext evidence and looking at your FMLA case, you have fundamentally excluded a key tenant, inappropriately I would add, of the first disclosed disability in September of 2017, or excuse me, the problem, the need for time off, the need for FMLA leave, that five-month attenuation is too far. Well, if that was our only evidence, I suppose I could see their point. So the first problem is saying that we're limited to only five months. The second is they miss and they fundamentally refuse to acknowledge this decision made within one week of when he asks for FMLA. What that shows is the intent and the motive of the decision makers. All matters that should go to a jury to consider, so rather than saying, well, five months later you have a termination, with all due respect, you actually have the intent of the very same decision makers and their response, you have that within just a week of the requesting of FMLA leave. And the third area we believe they erred. The ADEA. Mr. Lawson is without question qualified, he's without question of age, he's protected, he was 64 at the time that this decision was made. There's no question that he was laid off and that he was fired. And there's no question that they retained in his place two individuals that were substantially younger than him, either David Curry or also Mr. Anderson. Now, I'll get into pretext here just in a second and several reasons why I don't believe that this is worthy of credence, but the argument given is that because jobs were ramping down, we needed to get rid of our Quality Assurance Quality Control Department or at least one of our Quality Assurance Quality Control Individuals. And as further context, if you have a QAQC person who is being productive or who is generating funds for the company, they will bill to a client, such as Indorama. If they're not billing to a client, they're billing to what's known as overhead. And so to that extent, they're a fixed cost or a sunk cost. Interestingly, in this case, Mr. Anderson, again substantially younger, worked over the shop side. There was the industrial side where Mr. Lawson was, the shop side. It is indisputed in the record that Mr. Anderson worked over the shop which had shut down operations months prior to January. Mr. Anderson has been on overhead for months he's retained. Mr. Curry, again, project specific to Indorama. Indorama ends. Mr. Curry is retained, put on overhead, not simply laid off with everyone else laid off, but rather placed on overhead. Mr. Lawson, and I cite this in my brief, page 33 of my brief, I talk about and point through excruciatingly, it's from pages 1600 or excuse me, 1660 in the record to 1809. 1660 to 1809, over 100 pages we went through, Mr. Lawson was billing to 15 different projects, which makes sense because he had a roving nature of his job. He went from project to project. He wasn't project specific. He was their dedicated full-time QAQC. Only two of the 15 jobs that he was billing had layoffs. The other 13 jobs he was billing during a relevant time period all continued to bill. So when they say we're making this decision based upon slowdowns, a loss of work, a jury deserves to hear this evidence and know that of the three people that were QAQC, the only person who was billing productively was the one person let go. And that person happened to be in the protected age category, happened also to suffer from a disability, and most I think importantly in this case, his disability had manifested. It had shown himself and I think in the eyes of the company made him viewed as more liable, made him be viewed as weak, because if his heart was going to create conditions when he's on scaffolding ladders, they were concerned. They never expressed it, but clearly they had no problem with Mr. Lawson roving from job to job until all of a sudden he was viewed with less than favorable light when the high court ruled against Mr. Lawson. So I think there's a lot of pretext. I'd like to argue whenever I get into my rebuttal, but I'll briefly state, you may hear argument about the fact that David Curry and Anderson were over 40 years old. It's the substantially younger doctrine that applies here. We're dealing with people who were 17 and 20 years the younger of Mr. Anderson, not simply that it was 39 to 41, but rather the 20-year doctrine under O'Connor. I'll talk about that in one reply. So if we have your opening argument, you reserve rebuttal time. Thank you, Your Honor. May it please the Court? Your Honor, it's Blaine Wilson on behalf of Excel Contractors, LLC. I'd like to jump in to the initial question, is why retain David Curry and Keith Anderson and the record evidence in support of that? Anderson completed the Indorama Project, or his work on the Indorama Project, on January 11th, and Excel retained him beyond that date. And the reason is that his name was submitted in connection with this Juniper Planning Project, which was a small project of about five key project people who were going to go walk around the project and determine some way or another how the project would be built and executed. Lawson's resume was submitted in connection with the Juniper Construction Project, which In fact, it was much bigger than that. But during this time, Lawson was performing these Firestone closeout packages. And there's, as the trial judge referred to, there's a string of emails in the record indicating how important these Firestone closeout packages. And Lawson's deposition testimony explains as well how important these closeout packages are. The closeout packages are the key job responsibility of the QAQC inspector like Lawson. And his job is to go in the field first and see that the welds and everything are completed as required, and then there's the paperwork aspect. So not every project has a QAQC inspector, and some QAQC inspectors are actually representatives of the project owner. So here on some of these projects, Lawson would be hired. He would be a representative of Excel, essentially critiquing the work of Excel, and then certifying to the owner that that work is performed as required. But ultimately, when you look at the timesheets during this time, you see, again, David Curry ending on January 11 with the Indorama Project. You see Lawson ending on December 25th with his work, and Anderson sometime before that in December. It wasn't until February 19th that one of those three QAQC employees billed to another project, which was billed for approximately a week and a half before Anderson and Curry both quit. So for Lawson to have been replaced by Curry, and Lawson testified, he was the roving field inspector. He roved between multiple projects. You would see evidence on these timesheets with project numbers indicating that Curry was jumping back and forth between various projects. You only see one project, and that was over three weeks after Lawson was terminated, that actually had billable hours to it. And of course, the billable hours are just as in the law practice. Otherwise, it's being billed to overhead. So to understand the timesheets, your honors, Excel provided a cheat sheet in the record, as I call it, at 493, which explains how you determine whether a timesheet is showing billable work or not. And that's a pretty key piece of evidence to understanding all the timesheets in the records between Lawson, Curry, and Anderson. So the second half of that initial question proposed by counsel was, again, what's the explanation here? And Barry Carpenter explains in page 21 of his affidavit the exact reason why Excel first proposed Curry for the planning project while Lawson was being placed at the top of the organizational chart as a QAQC manager, effectively would have been promoted to that position in connection with the big Juniper construction work. And he says at paragraph 21 that Lawson was still working at the time Excel submitted Curry's resume for the Juniper planning project, Lawson was still working on the Firestone closeout packages, which required his full attention because Excel was months behind on receiving payment for its construction services due to the inability to complete the packages. In the event Excel successfully obtained the Juniper planning work, Curry would have been called out to Juniper before Lawson completed the closeout packages. By contrast, the large Juniper construction project for which we proposed Lawson as QAQC manager would not commence for some time. So in a broader perspective, the plaintiff is trying to show some discriminatory animus, that Excel is looking for a reason to terminate him, and also a retaliatory animus, that we were mad that he took FMLA leave. But the reality here is we're proposing him to be the head of what may, he may have been managing, he was again the head site QAQC guy in this bid submission to Juniper. Of course, we didn't get the Juniper project. And strangely, Juniper denied the construction part, the big part for which Lawson was a part, but did not deny the planning work for which Curry's application had been submitted to early. So therefore, as Barry explains in his affidavit, Excel decided to retain Curry to allow Juniper to make a decision, which ultimately wasn't made until sometime after Curry quit within about a month or so of Lawson's termination. So, and another aspect is in Ligo's deposition, and counsel explain that generally a contract employee, for instance, Curry on the Indorama project is let go. But Ligo explains it on 560 of the record, that when the project is over, we get rid of them, unless another big one just happens to start up and we can roll them over to the next. And that's what happened with Curry, and that's why he was retained. Again, his name was submitted in connection with the Juniper planning project in order to allow Lawson to complete the Firestone packages that had been delaying payment for months. So ultimately, counsel makes, or Lawson makes no effort to explain how that reason is pretextual, how it's false or unworthy of credence. And frankly, in the record, I don't know of any evidence in the record that suggests that Curry was roving around between jobs because the timesheets say otherwise. The timesheets say it was not 25 days until after Lawson terminated that Curry built one project, and he only built one project during his employment with Excel. Counsel says, you know, his version of it is what he said. He says it's animus, and he says at bottom, even if all that was true, he deserves a trial. So his complaint is that he was tossed at not having established his prima facie case. So his urging to us is that he should get to the jury to say all that and let them sort it out. So his first take was that he was poured out based on not having established his prima facie case. So just without giving us more detail about what's in there, you know, just sort of hit head on those main tenets. So is the district court correct or not, or what? So in the district court, it was correct in that respect because Excel bears the burden of production. The plaintiff bears the burden of persuasion under Code of Evidence Article 301. And that's why each and every element of Excel's explanation, its legitimate non-discriminatory reason, which I just explained in the context of this reduction in force, that the standard, the burden that he has to meet to survive summary judgment is that those reasons are explanations as to why, or the burden of production, I should say, that we've produced, non-discriminatory reasons, that he has now the burden of proving that those were pretextual. And that's, with respect to those matters, he didn't do in the trial court and still cannot do today. All right. So with respect to— The claim of disability, he says, you know, he had high blood pressure and something else and established the disability, the employer, the regarded or disregarded. What do you say about his ADA claim? So a disability defines a physical or mental impairment that substantially limits one or more major life activities of that individual. We acknowledge he has high blood pressure. We acknowledge, I think it's reported in the record as around 30% blockage in an artery, which is perfectly normal for somebody his age. That's the only medical testimony that there is. And he's referring to the second part of major bodily functions. And, of course, circulatory system issues may give rise to a disability. But there's no medical evidence in the record explaining how a 30% blockage renders him disabled in order to survive the prima facie aspects of that case. And, of course, even if he survives prima facie, there still has to be evidence of discrimination, which, of course, is addressed in the same arguments as I've made previously. So it's not to say that a 30% blockage could potentially impair, substantially impair, substantially limit, rather, a major life activity. But there's no medical evidence. By contrast, the only medical evidence are two doctor's notes that release him without restriction to go climb scaffolding, to go climb through big pipes to inspect welds in the heat and cold and everything else without restriction. So had there been medical testimony, then there might be evidence for a jury to consider. But we have a complete record at this time with the conclusion of discovery. So to briefly address the other individual, Anderson, the non-discriminatory reasons we gave for Anderson were the fact that he had been employed by Ron Williams Construction for five years, longer than Lawson had. And Excel acquired Ron Williams and used that organizational framework to perform its QAQC functions. So in retaining that organizational framework, one of the reasons is that Anderson was a senior employee. The other reason is, again, it goes back to these Firestone packages, that Barry Carpenter, Excel's retired QAQC director, who ultimately decided to promote Anderson, explained the QAQC manager position was giving additional job responsibilities to Anderson at a time when Lawson was already struggling and behind with respect to the Firestone closeout packages. So those are the two reasons in connection with Anderson's promotion. And we view Anderson's promotion as distinct from Anderson's retention beyond Lawson's employment. They've addressed that in sort of a nebulous that it's either or. But after Lawson's employment, Anderson was a manager. Lawson was not a manager. He was just the QAQC personnel. And they were not similarly situated comparators at that point in time. So that's why we address primarily the promotion of Anderson as the potential for discrimination because Anderson's retention beyond. And there is, in Legro's deposition, an explanation. And I'll start. Legro was not a 30B6 deponent of Excel. He had left Excel, and he was living somewhere up north working for a different company. Excel was never deposed. Anderson was never deposed. Curry was never deposed. Nor was Barry Carpenter ever deposed in connection with this. And I don't want to give the court the impression that I'm trying to distance ourselves from Legro's deposition testimony. But he was not a prepared 30B6 deponent. Frankly, he didn't remember the promotion of Anderson over Lawson. So there's some fags there that really just don't give them a whole lot of evidence without taking the deposition of Excel. The only real evidence of Excel's positions are discovery responses and Barry Carpenter's affidavit and the HR director's affidavit for the most part. And there's a couple other matters in there. But ultimately, Lawson bears the burden of proving some discriminatory animus motivated this employment decision. And this animus, to the extent it exists, would have to occur at a point in time where Excel is taking substantial objective efforts to retain Lawson's employment. They put him on this huge Juniper project as a promotion, essentially. And that is just such a problem for their case in proving that there's a genuinely disputed issue of animus when Excel is trying to give him this massive job where he's going to be managing multiple people under him. Secondly, I would say that there's a continued period where his work was declining. His billable work was declining, as it was with all people. He contests the existence of the reduction in force. And I'd note that in his deposition, Mr. Lawson says he doesn't have any reason to dispute that Excel was engaged in a reduction in force at that point in time. So ultimately, Curry's retention beyond Lawson is a product of circumstance. It was a logistical consideration that Barry Carpenter made in order to allow Lawson to complete the Firestone packages and not distract his full attention to completing that work that had been months and months behind. So unless the court has any additional questions, I think I'm just repeating myself at this point. All right, sir. We'll take you into work. All right, we'll back to you. Thank you, Your Honors. Judge Stewart, let me address the question that you asked that I think is very much so correct instead of bogging myself down in the facts. At the end of the day, this is a summary judgment. We are postured here at summary judgment. And I would implore the courts to look at the district court's memorandum ruling, which I think can be read in no other way than construing facts in light favorable to Excel, doing the exact opposite of what they must do for purposes of summary judgment. I think if you take Barry Carpenter's affidavit, if you take Excel's positions, and you construe them in the light most favorable to them, every argument I heard from my opposing counsel makes sense. For a summary judgment standpoint, and construing the facts in the light most favorable to Mr. Lawson, there is no question that this creates a genuinely disputed issue of material facts on all three claims. Briefly to the disability point, it is rather remarkable to hear that there is no medical evidence in the record, considering the following. Number one, at 1657, 1658, my client discloses the high blood pressure. He discloses he's taking medicine for control. He details the medicine he's having to take for that. They don't contest that he has the high blood pressure nor the cardiac piece. So I didn't hear that as the contest. Right. But the next contest began with something that's nowhere in the record, which is that 30% heart blockage for someone of my client and his. Well, what he's saying, at least as I read it, they don't dispute that your client had the condition. But he's saying no evidence is offered by a doctor or somebody else from which one can construe this is a limitation, blah, blah, blah. It's just saying, I have the condition. And the way they argued in the brief that there's lots of people in the population that take statins and have high blood pressure, but they're not being disabled for purposes of the claim. So I'm not trying to overstate it. But I'm just saying they don't seem to dispute that your client had the medical situation. So what's the evidence that the district judge should have latched on to to get beyond just the fact that he had it? Sure. Two points to that. First, the argument by itself that the 30% blockage is routine and nothing beyond what someone of his age would have. There is no medical evidence or expert opining that. That's simply their opinion that 30% does not limit him. What actually is in the evidence, and this is my second point, what actually is in record is Dr. Mulhern and the medicine he prescribes to him and the fact that he was taken off work for two weeks to deal with this. And when he was sent back to work, he did not have any restrictions. But you also have, in addition to his medicine they don't dispute, in addition to Mulhern, in addition to the time off, what you also have is Lawson's own deposition testimony talking about the fact that if he does not take this medicine for his blood pressure, if it did not control the blood pressure, you would have more incidents like what you saw on August 21, 2017. So to simply state that he has high blood pressure and 30% is normal or routine ignores what actually happened over those two weeks. But just taking the medicine didn't impede his working, did it? Is there any evidence of that, that because I take this medicine, I have to rest every now and then? Is there any evidence of that? That's what I understand is the problem. There's no evidence of disability. He's taking the medicine. He's taking the medicine, and Your Honor, to that point, requiring that it limit his work is not required under the ADA. All it requires, it limits one essential function, which could be sleeping, living, eating, waiting, walking. Well, what is the limiting function? The limiting function. The limiting function under 1202, when it was extended in 2008, the limiting function extends to major bodily functions. And the fact that this extends to his cardiovascular system and how his system works, that it cannot work. What is limiting function in this case, not what the law says? What are you saying he's limited doing? It seems to say he takes the meds. You're not arguing that they prevent him from taking the meds. So if he takes the meds, I mean, I don't see. But if I put my glasses on, I can see. So if he takes the meds, are you arguing that they didn't let him take them? What's the disability in terms of him being able to do the major project? Just simply put in a declarative statement. What is it? If Your Honors disagree with there's a limit that exists with Mr. Lawson, we did also plead in our brief that he is regarded as disabled. And that comes from 1903 when he mentions disability in his email and the fact that Excel began to view this person as someone who was more weak and more of a liability. So if there is no clear limit that the court sees if he takes his medicine, he at the bare minimum. Take anyone's deposition who then asserted how they responded or acted towards your client with respect to the medical condition. Is there a deposition of someone that just lays out for us to read how they reacted to all of this? I would say two individuals. One, well, no, scratch that. Susan would not be someone that would answer your question. Ligros. And in response to my opposing counsel's point about Ligros as a very carpenter in the written discovery, they identified Ligros. Even though he wasn't under their control anymore, they identified Ligros as someone who was a decision maker in this case. I'll ask you one more time. I'm saying did you decode any person from Excel or otherwise whose deposition we can read and we would glean from that that that person or persons regarded your client as disabled or unable to do the functions, et cetera. I mean, some witness that if we go in here, will we find a deposition? That's all I'm asking, not disavowing the claims you're making. We're just trying to figure out when we look in here, what we should be looking for. That's all. I mean, you've got a red light. If you can answer that question real quick, that'll be good. Yes, Your Honor. I would tell the court to look at Ligros' deposition. I depose Ligros. Just the reason I hesitated is I don't want to say something dishonest to the court. As I sit here today, I don't recall exactly if Ligros mentioned or testified on the regarded as component of the disability. That is the deposition I would tell Your Honors to go look at. I simply hesitate. I don't want to refer affirmatively that Ligros talked about regarded as, but I would turn you to Ligros. Well, that's fine. You can rest assured whatever is in this record, we will read it more than once. Absolutely. So all we're trying to do is get some help with where to look and what to look for and for what purpose it's offered. But we'll examine the record closely to see what the district court had before, as well as what's properly put the case for argument in order to allow counsel to illuminate what we should be looking at, et cetera, et cetera. But we will do the due diligence, and we'll figure it out, and we'll decide it, and let you know. So we appreciate both of your briefing and oral argument in the case. This concludes the cases that are docketed for this panel for oral argument for this week. They, along with the cases that have been submitted as non-orally argued, will all be submitted to the panel, and we will get them decided. Having said that, this concludes our session, and this panel will close.